**SIGNED this 18th day of October, 2007.**

_____

**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| SANDY EUGENE SANDERS & BONNIE JEAN CHYMERYC-SANDERS | 07-50783-C |
| _DEBTORS_ | CHAPTER 13 |

## DECISION ON OBJECTION BY FORD MOTOR CREDIT TO CONFIRMATION OF CHAPTER 13 PLAN

CAME ON for hearing on August 16, 2007 the foregoing matter. Ford Motor Credit Company LLC objected to confirmation, on grounds that the plan did not accord to it proper treatment of its secured claim on a motor vehicle under the hanging paragraph to section 1325(a).

### BACKGROUND FACTS

The facts are not in material dispute, and are largely set out in a single exhibit. The debtors filed their bankruptcy case on March 30, 2007. The debtors purchased a 2005 Ford Explorer from a local dealer on December 4, 2004, 846 days before their bankruptcy case. They financed their purchase with Ford Motor Credit (FMC), using a Texas Simple Interest Motor Vehicle Retail Installment Sales Contract (a form whose format and disclosures are mandated in part by the Texas

Finance Code, discussed in further detail *infra*). According to the contract, the cash price for the vehicle was $26,523.05.

Also, according the contract, the debtors traded in to the dealer their previous vehicle (a Chevy Tahoe), at a trade-in value of $8,000. Unfortunately, the payoff due the lien holder on the trade-in vehicle was $10,324.13, leaving the debtors "negative" on their trade-in by $2,324.13. The trade-in thus contributed nothing to the purchase price of the new Explorer. To the contrary, the trade-in was a liability to the transaction. The dealer of course wanted to sell the vehicle, and so had an interest in facilitating the purchase. The debtors, as buyers, needed to "off-load" the liability associated with the old vehicle in order to buy a new vehicle. The dealer meanwhile needed to pay off the previous lien in order to acquire clear title to the trade-in vehicle, in order to be able to re-sell that vehicle.

The dealer could have absorbed the pay-off as a cost of doing business, or the dealer could have required the debtors, as buyers, to come out of pocket up front to pay off the remaining balance due. The deal that was struck, however, has become relatively common in the industry: the dealer arranged[1] for the debtors to reimburse the dealer for the cost of paying off the negative equity, by having the debtors borrow the needed money from the vehicle financer (FMC), and having the debtors pledge the vehicle as collateral for this advance. This advance to pay off the "negative equity" was thus included in the principal balance ultimately financed in this transaction.

The debtors were then credited with a $2,500 rebate from Ford through the dealer, yielding what the retail installment contract calls a down payment of $175.87. Added to the amount to be

---

[1] Any other characterization of the transaction would ignore reality. Retail installment contracts are essentially adhesion contracts – its terms are dictated by the dealer (and the financer). That is the nature of consumer transactions, the notion of freely bargained for rights and obligations in such agreements is a perverse legal fiction that only the courts indulge.

financed were the dealer's inventory tax, sales tax, registration fees, a certificate of title fee, and document preparation fee, all totaling $1,183.32. This amount was added to what the retail installment contract identifies as the "cash price." The small down payment was subtracted to come up with a principal balance of $27,530.60. The "principal balance" is the amount financed in retail installment contracts in this state, and this contract imposed a finance charge of $583.35 (in this contract, an annual percentage rate of 9%). The total payments due under the contract to repay this total was $28,223.85, to be paid out in 35 payments of $361.61, and a final payment in December 2007 of $15,457.50.[2]

After the bankruptcy filing, FMC filed a proof of claim on April 10, 2007 for the net balance owing of $19,731.28. The debtors in June 2007 amended their chapter 13 plan. With respect to FMC, the plan recognizes the amount of the claim, but bifurcates the claim into two parts—a secured claim based on the debtors' estimate of current value of the vehicle at $16,225.00, and an unsecured claim for the remaining deficiency in the amount of $3,506.00. The plan then proposes to pay FMC's secured claim at the rate of $394.02 per month, and at an interest rate of 10%. In short, the debtors treat FMC consistent with section 1325(a)(5), and without regard to the hanging paragraph appended to the end of section 1325(a), believing that FMC's claim does not qualify as a "910-day" claim under that hanging paragraph. FMC, of course, objected, on grounds that, in their opinion, their claim *does* qualify as a "910-day" claim under that hanging paragraph.

Both parties argued their positions to the court at the confirmation hearing, presenting both briefing and cases. The chapter 13 trustee took no position on the matter, instead choosing to await

---

[2] Functionally (and from a finance perspective), this is actually a three year lease with a purchase option at the end. The contract provides that the buyer may, at the end of the term, return the vehicle in lieu of paying off the balloon, at no further cost to the buyer (subject, of course, to *provisos* regarding wear and tear and excess mileage).

the court's ruling on the question, and to then evaluate whether the plan would be feasible depending on that ruling. The court reset the matter for ruling for October 18, 2007.

## POSITIONS OF THE PARTIES

FMC claims that its claim qualifies for exclusion from "cram down" because it qualifies as a "910-day" claim under the hanging paragraph which concludes section 1325(a), hereinafter referred to in this decision as the 910-day provision, the "hanging paragraph," or section 1325(a)(*).[3] If a claim qualifies as a 910-day claim, then it is excluded from the bifurcation effect of section 506 and so must be handled in a chapter 13 plan as a fully secured claim, regardless the value of the collateral. *See* 11 U.S.C. § 1325(a)(*); *see generally In re Pajot*, 371 B.R. 139 (Bankr. E.D.Va. 2007) (setting out an extensive and scholarly analysis of the statute and its operation). The debtors say that the claim in question does not qualify as a 910-day claim, even though the vehicle in question was purchased within 910 days of the bankruptcy filing. The debtors base their position on the language of the subsection, which applies the special treatment only if the creditor "has a purchase money security interest securing the debt that is the subject of the claim . . . and the collateral for that debt consists of a motor vehicle . . . ." *See* 11 U.S.C. § 1325(a)(*). Granted, say the debtors, the creditor in this case lent money for the purchase of the vehicle in question, but it also lent money as an advance to pay off the remaining debt owing to the previous creditor that had a

---

[3] The writers of the statute in 2005 used a convention not previously used in the Bankruptcy Code (or in most other federal enactments, for that matter). They appended new "flush" paragraphs at the end of a series of numbered subsections, but did not assign any numbering or lettering to designate the separate paragraph. The placement of the paragraph in this particular case makes it part of section 1325(a), but the lack of any numbering makes it difficult to reference in briefing and opinions. While many courts have adopted the convention using the asterisk to refer to this newly appended paragraph, *see, e.g., In re Pajot*, 371 B.R. 139, 143 n.2 (Bankr. E.D. Va. 2007), at least one apt judge recognized the problem that this convention presents for those searching the Westlaw and Lexis databases due to the fact that the asterisk is a wildcard character. *See In re Trejos*, 352 B.R. 249, 253 n.5 (Bankr. D. Nev. 2006). Thus, this court will adopt all of these conventions by referencing section 1325(a)(*), the "hanging paragraph," and the "910-day provision" interchangeably. With any luck, future amendments to the Code will avoid appending these unnumbered flush paragraphs.

security interest on the vehicle used as a trade-in.  The latter portion of the loan, say the debtors, was *not* a purchase money loan.  Thus, say the debtors, because the debt owed FMC is not entirely purchase money, the debt does not qualify for the 910-day exclusion from section 506.  FMC's claim (or perhaps some portion of it) can therefore be "crammed down" under section 1325(a)(5).

The debtors' argument relies in part on section 9.103(f) of the Uniform Commercial Code, as adopted in Texas,[4] which addresses purchase money security interests in general.  That section states that a purchase money security interest does not lose its status even if the purchase money collateral also secures an obligation that is not a purchase money obligation—but limits that protection to "a transaction *other than a consumer-goods transaction* . . . ." *See* TEX. BUS. & COMM. CODE § 9.103(f)(1) (emphasis added).  The debtors argue that the highlighted language means that, in the consumer context (including consumer purchases of motor vehicles), purchase money status is an all-or-nothing proposition.  They then argue that, because the bankruptcy statute uses a term of art informed by state law, this same all-or-nothing status applies to the term as used there, so that a creditor whose claim includes non-purchase money debt (such as, for example, an advance to pay off negative equity from a trade-in) does not qualify for the 910-day exclusion.  Alternatively, and understanding that state common law might permit a court to accord "dual status" in the consumer context—*i.e.*, purchase money status for the portion of the loan representing purchase money, and non-purchase money status for the portion of the loan that does not—the debtors argue that FMC's claim is only a 910-day claim to the extent that the debt is attributable to the purchase money portion of the loan.  *See In re Pajot*, 371 B.R. at 157-58.

---

[4] Title 1 of the Texas Business and Commercial Code contains the Texas Legislature's enactment of the UCC.  For the purposes of this opinion, all references to the UCC or the Texas Business & Commercial Code may be construed as interchangeable.

FMC counters that state law actually favors treating all of its debt as purchase money in nature, including the part used to pay off negative equity from the trade-in. FMC asks the court to focus on that aspect of section 9.103(a) of the UCC that defines a purchase money obligation as "an obligation . . . incurred as all *or part* of the price of the collateral or for value given *to enable the debtor to acquire rights in* or the use of the collateral if the value is in fact so used." *See* TEX. BUS. & COMM CODE § 9.103(a)(2) (emphasis added). Though with somewhat less enthusiasm, FMC also points to the murkier definition of "purchase money security interest" offered in subsection (b)(1), which explains that "a security interest is a purchase money security interest (1) *to the extent that* the goods are purchase-money collateral with respect to that security interest." *Id.* § 9.103(b)(1) (emphasis added). FMC notes that, in this case, no one disputes that at least *part* of the debt in this case was incurred for the purpose of enabling the debtors here to acquire the Explorer. FMC maintains as its primary argument, however, that *all* of the debt was incurred for that purpose, because the debtors here would not have been able to purchase the new vehicle unless they were able to trade in their old vehicle—and that could not have happened unless the previous creditor released its security interest, which in turn could only have occurred if the previous creditor's debt was paid in full.[5]

Armed with this interpretation, FMC too argues that "purchase money security interest" used in section 1325(a)(*) of the Bankruptcy Code, not otherwise defined in the Code, must be read to

---

[5] Of course, these passive voice characterizations of FMC's argument mask the true tenor of the "bargain." In such consumer transactions, the buyer/borrower has virtually no bargaining power, other than the "power" (if it can be called such) to walk away from the transaction entirely. *See, e.g.,* Kimm Tynam, *Pennsylvania Welcomes Pre*datory *Lenders: Pennsylvania's Act 55 Preempts Philadelphia's Tough Ordinance but Provides Little Protection for Vulnerable Borrowers,* 34 RUTGERS L.J. 837, 845-46 (2003) (discussing the lack of any real bargaining power held by consumers in credit transactions, as they tend to be offered on a "take-it-or-leave-it-basis") (citing Kathleen E. Keest & Elizabeth Renuart, Nat'l Consumer Law Center, *The Cost of Credit: Regulation and Legal Challenges* 483-86 (2d ed. 2000)).

import state law interpretation of the term of art—though the interpretation offered by FMC is very different. FMC says that the negative equity advance does not in any way undercut or limit FMC's purchase money security interest status under the hanging paragraph to section 1325(a). To the contrary, FMC says that state law indicates that the term of art should be read to include the advance for negative equity such that the advance has no negative effect on its status as a 910-day claim.

FMC has additional arguments as well. FMC points to the Texas Finance Code, which has a section devoted to "Motor Vehicle Installment Sales." *See* Tex. Fin. Code §§ 348.001 *et Seq.* (Vernon 2006). FMC says that this state enactment should be read *in pari materia* with Article 9 of the UCC, and when it is, says FMC, the Finance Code's provisions lend further support to FMC's version of the meaning and extent of the term of art, "purchase money security interest."

Next, FMC points to the manner in which security interests in motor vehicles may be perfected. In Texas, as in most states, there is a Certificate of Title Act which provides the exclusive method for perfecting security interests in motor vehicles. *See* Tex. Transp. Code § 501.111 (Vernon 2007). Once a lender has taken a security interest in a vehicle to collateralize the finance obligation of the principal balance owed under a retail installment contract, that security interest can only be perfected by a notation on the Certificate of Title issued for that vehicle. No other security interest can be recognized other than those noted on this certificate. *See* Tex. Bus. & Comm. Code § 9.109(c)(2). Competing liens not recorded on the certificate of title cannot be enforced. Thus, says FMC, all of the security interest must perforce be purchase money, as there could be no other junior liens anyway.

## ANALYSIS

The 910-day provision found in the flush paragraph at the end of section 1325(a) was enacted as part of the Bankruptcy Abuse and Consumer Protection Act of 2005 (BAPCPA), which substantially amended the consumer provisions of the Bankruptcy Code.  Section 1325(a) of the Code governs the prerequisites for confirmation of a Chapter 13 plan for individual debtors, and has long included a provision with respect to the treatment of secured creditors, mirroring the "cram down" provisions in Chapter 11 with respect to such creditors.  The mechanics are simple: a creditor with a security interest is only secured to the extent of the value of its collateral, while the balance is to be treated as a separate unsecured claim.  *See* 11 U.S.C. § 506(a).  With respect to the secured part of the claim, the debtor's plan can be confirmed so long as the plan gives to that creditor a stream of payments with a present value equal to the value of the creditor's collateral (with the collateral continuing to secure that part of the claim).  *See* 11 U.S.C. § 1325(a)(5)(B)(ii).  This gives the debtor a powerful weapon with which to deal with car creditors because, as a practical matter, such creditors usually find that what they are owed exceeds the value of the car that secures the claim.  Outside of bankruptcy, of course, a car creditor's being underwater only matters if the creditor actually has to repossess and sell the car to satisfy its claim.  So long as the debtor wants to keep the car, however, the only way for the debtor to get a release of the security interest on the car is to pay off the car debt in full.  Inside bankruptcy, however, the debtor is permitted to "mimic" what would happen in the event the lender sold the vehicle to satisfy the debt, but without the consequences of actually losing the car.  A court rules what that value would be, without actually exposing the vehicle to sale, and the resulting number becomes the number that ends up being

"financed" by way of section 1325(a)(5)(B)(ii).[6] The balance of any debt owed the creditor is then separately treated as unsecured debt, paid pro rata along with other unsecured creditors.

Prior to the enactment of BAPCPA, the effect of this "cram down" or "strip down" forced car lenders to swallow a deficiency loss (unsecured claims in most chapter 13 cases are paid only a small fraction, if at all) while also forcing them to wait for a payout on a now-reduced loan balance, with all the attendant risks of default that accompanied the original loan. In addition, they were faced with the prospect that, at the end of the day, the debtor might still default, leaving the lender with a much-depreciated asset years down the road. One remedy that Congress enacted in apparent response[7] to car lender complaints is evident in the hanging paragraph under discussion here. That provision, set forth in footnote below,[8] eliminates bifurcation and the resulting cram down in value with respect to car creditors if the car was purchased within 910 days of the filing of the case, and "if the creditor has a purchase money security interest securing the debt that is the subject of the claim." See 11 U.S.C. § 1325(a)(*). If this special provision applies, then a debtor's plan must treat the entire claim of the creditor as secured, regardless the value of the collateral (though there is some

---

[6] The "financing" occurs by means of developing the stream of payments with a present value equal to the value of the vehicle, as determined by the court. A stream of payments over time, in order to have a present value equal to the set value of the car, has to contain an interest component. The interest component is derived from the discount rate appropriate to produce the correct present value for the income stream. The discount rate is in turn a reflection of risk and market forces appropriate to that income stream, given the circumstances (including who is responsible for the stream of payments, what the market expects to recover for an income stream of this risk, duration and degree of collateralization, and the like).

[7] The legislative history to BAPCPA is skimpy, so tying legislation enacted to lobbying efforts is a bit of guess. See In re Quick, 371 B.R. 459, 463 n.10 (10th Cir. B.A.P. 2007). Nevertheless, this court will follow recognized, traditional statutory tools of construction to divine legislative intent where intent is necessary to interpret ambiguous provisions of the Bankruptcy Code as amended.

[8]  For purposes of paragraph (5) [of section 1325(a)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor . . . .
11 U.S.C. § 1325(a)(*).

disagreement in the cases regarding whether the interest rate in the agreement can be adjusted). There is a lively dispute in the case law regarding the application of the requirement that the creditor have a "purchase money security interest securing the debt that is the subject of the claim . . . ." *See id.* The parties have framed the dispute in their arguments and briefing to the court, and their arguments fairly accurately depict the scope of the dispute in the case law. *See generally In re Pajot*, 371 B.R. 139 (Bankr. E.D.Va. 2007) (collecting and summarizing cases and the scope of the dispute). One line of cases (including *Pajot*) concludes that "purchase money security interest" does not include funds advanced to pay off negative equity resulting from the trade-in of the debtor's old vehicle, and, as a result, the 910-day provision does not protect claims which include those funds. *See In re Peaslee,* 358 B.R. 545 (Bankr. W.D.N.Y. 2006) [*In re Peaslee I*], *rev'd by* --- B.R. ----, 2007 WL 2318071 (W.D.N.Y. Aug. 15, 2007) [*In re Peaslee II*]; *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007); *In re Westfall*, 365 B.R. 755 (Bankr. N.D.Ohio 2007), *supplemented by* 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007); *In re Bray*, 2007 WL 10954535 (Bankr. W.D.Tenn. April 11, 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D.Cal. 2007); *see also In re Huddle*, 2007 WL 2332390 (Bankr. E.D.Va. August 13, 2007) (holding that purchase money status was lost completely when loan was refinanced to pay off original purchase money loan and also to purchase a motorcycle). Another case, which was affirmed at the district court level, holds that the "purchase money" in "purchase money security interest" may include funds advanced to pay off that negative equity, so that the creditor is not thereby disqualified from inclusion as a 910-day claim. *See Graupner v. Nuvell (In re Graupner*), 356 B.R. 907 (Bankr. M.D.Ga. 2006) [*In re Graupner I*], *aff'd*, 2007 WL 1858291 (M.D.Ga. June 26, 2007) [*In re Graupner II*]; *see also In re Petrocci*, 2007 WL 1813217 (Bankr. N.D.N.Y. June 20, 2007); *In re Cohrs*, 2007 WL 2186135 (Bankr. E.D.Cal. June

-10-

25, 2007).

Both lines of cases acknowledge that the Bankruptcy Code does not itself define "purchase money security interest," though the phrase is used both here in section 1325(a)(*) and in section 522(f) (relating to the avoidance of liens that are *not* purchase money security interests). However, Congress is deemed to understand the context in which terms of art are used, and to intend the term to take on its ordinary meaning within that context. *Envtl. Def. v. Duke Energy Corp.,* --- U.S. ----, 127 S.Ct. 1423, 1437 (2007) ("When Congress repeats the same word in a different statutory context, it is possible that Congress might have intended the context to alter the meaning of the word.") (citation omitted). Context is important because it gives courts insight into the meaning Congress may have intended. In addition, when a statutory term is undefined within a given piece of legislation, that term is normally expected to be given its ordinary and generally understood meaning within the statutory context. *See* 2A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 47:27 *et Seq.* at 443-86 (7th ed. rev. 2007) ("There is a presumption that the legislature intended to use the actual words it utilizes in the statute, which in turn, as noted, are intended to be utilized in the ordinary and common meanings.") This is especially so when Congress employs a term of art that has acquired a meaning in the non-bankruptcy context. *See id.* § 47:27, at 448-55.

"Purchase money security interest," or "PMSI," is a term of art used in Article 9 of the Uniform Commercial Code, and it is fair to conclude that Congress was aware of this usage when it employed the term in the Bankruptcy Code. It is, thus, appropriate to examine UCC law to see what PMSI means in that context and to counsel this court in understanding the meaning of PMSI within the context of this section of the Bankruptcy Code. We do so, however, with a couple of *caveats*. First of all, while section 9.103 of the Texas Business and Commercial Code (the UCC as

-11-

enacted in Texas) sets out the general definition of PMSI, section 9.103(h) warns that the definitions

in section 9.103 may be applied somewhat differently in consumer transactions, especially when the

facts indicate that not all of the loan proceeds were used as purchase money for the collateral.

Secondly, the Official Comment to 9.103 warns that:

> Whether a security interest is a "purchase money security interest"
> under other law is determined by that law.  For example, decisions
> under Bankruptcy Code Section 522(f) have applied both the dual-
> status and the transformation rules.[9]  *The Bankruptcy Code does not*
> *expressly adopt the state law definition of "purchase money security*
> *interest."   Where federal law does not defer to this Article, this*
> *Article does not, and could not, determine a question of federal law.*

TEX. BUS. & COMM. CODE § 9.103, Comment 8 (emphasis added).  Thus, while state law (especially

Article 9 of the UCC) furnishes an appropriate starting point, Article 9 itself warns that its

definitions (and, by extension, state decisions construing those definitions) are not binding on the

federal courts when they construe the term as used in the federal enactment.  The importance of this

observation will become clearer later in this decision.  For now, however, we explore what the term

of art means in Texas in order to better understand what the term might mean as it is used in section

1325(a)(*).

### How Does Texas Law Define "Purchase Money Security Interests"?

Section 9.103 of the Texas Business and Commercial Code is, on its face, straightforward.

First,[10] we are told that a "purchase money obligation" is an obligation of the borrower incurred (1)

as *all* or *part* of the price of the collateral or (2) for value given to enable the debtor to acquire rights

---

[9] A "dual status" rule holds that, when less than all of the loan constitutes purchase money, the special rules regarding PMSI may still apply to that portion of the loan that is purchase money.  The "transformation" rule says that, if less than all of the loan proceeds are for purchase money, then the loan is transformed into a non-purchase money security interest.

[10] Actually, this is not the first definition in order.  It is the logical first term, however, because it forms the basis for defining the remaining terms.

-12-

in the collateral, if the value is *in fact* so used. TEX. BUS. & COMM. CODE § 9.103(a)(2) (emphasis added). Next, it tells us that "purchase money collateral" means goods that secure a purchase money obligation. *Id.* § 9.103(a)(1). Finally, a security interest is a "purchase money security interest" with respect to goods *to the extent that* the goods are purchase money collateral (one of the defined terms). *Id.* § 9.103(b)(1).

If there is ambiguity in this formulation, it is to be found in two phrases, "price" and "value given to enable," both used in the definition of "purchase money obligation." In apparent anticipation, the Official Comment offers the following insight into how these terms ought to be considered:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligation.

*Id.*, Comment 3. The Comment adds that the concept of "purchase money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. *Id.* Figuring out what counts as "price" or "value given to enable" tells us what part of the loan counts as purchase money. For our purposes, the important question is this: does that portion of the loan used to pay off the negative equity nonetheless count as part of the "price of the collateral," or as "value given to enable the debtor to acquire rights in the collateral"?

### *Does the "Price of the Collateral" include Negative Equity?*

First, we focus on how the meaning of the "price of the collateral" as that terminology is used in the UCC. The case law grappling with this issue has reached opposite conclusions, when trying

-13-

to decide whether the term could include the negative equity paid off by part of the loan.

The bankruptcy court in *Graupner*, applying Georgia law,[11] concluded that "price" was an ambiguous term, because ". . . in the context of the statute [*i.e.*, UCC § 9-103], the extent or reach of the term is uncertain." *In re Graupner I*, 356 B.R. at 919. That court elected to examine other state statutes to see whether they might shed light on how to interpret it, including in particular Georgia's statute regulating vehicle sales financing. It did so in part in reliance on Georgia Supreme Court authority explaining the circumstances under which the interpretative doctrine of *in pari materia* might be used to allow one statutory enactment to inform the interpretation of an ambiguous term in another statutory enactment. *Id.* at 920. Texas permits use of that doctrine as well, under certain circumstances discussed more fully *infra*. *See* TEX. GOV'T CODE, § 311.026(a) (Vernon 2005) ("*If* a general provision *conflicts* with a special or local provision, the provisions should be construed, if possible, so that effect is given to both.") (emphasis added).

On the other hand, the *Pajot* court (and a number of other decisions) found no ambiguity in the phrase "price of the collateral," concluding that the term "means nothing more than 'the actual price of the collateral being acquired.'" *Pajot*, 371 B.R. at 149 (quoting *In re Peaslee I*, 358 B.R. at 556). But exactly what constitutes the "actual price" is precisely what is problematic. Even the Official Comment to section 9.103 acknowledges that "price" is *not* in fact simply the "actual price" of the collateral itself, offering a listing of "obligations for expenses incurred in connection with acquiring rights in the collateral" that can also be considered part of the "price of the collateral." TEX. BUS. & COMM. CODE § 9.103, Comment 3. Thus, there is at least some question at the margins

---

[11] Georgia's version of section 9.103(a) and (b) is identical to Texas' version. *See* OFF. CODE GA. ANNO., § 11-9-103.

of the definition, where it is at least legitimate to ask how far the "price net" can be cast.

FMC invites the court here to examine other statutes for assistance.  However, in Texas, the application of the doctrine of *in pari materia* has three pre-conditions that must first be met:  the statutes to be construed together must (1)  concern the same subject matter; (2) relate to the same person or class of persons; or (3) have the same object or purpose.  *See In re J.M.R.*, 149 S.W.3d 289, 292 (Tex. App.—Austin 2004, no pet.).  If these preconditions apply, then the doctrine of *in pari materia* permits a court to construe the statutes in question together, with the goal of harmonizing them if possible.  Only if they cannot be harmonized will the specific statute then control over the general.  *See id.*

We can quickly dispose of one statute as a candidate for application of the *in pari materia* doctrine.  FMC relies on Texas' Certificate of Title Act as one statute which ought to inform our understanding of the term "price of the collateral."  That statute makes notation on a certificate of title the exclusive means for perfecting a security interest in a vehicle.  *See* TEX. TRANSP. CODE § 501.111 (Vernon 2007).  FMC argues that this exclusive means of perfection means that it is always completely perfected as against other lien claimants by its notation on the title, so the entire loan must perforce be secured by its "purchase money security interest."  But the argument proves too much.  In *Graupner*, on which FMC relies, that court observed that "[t]he effect of this statutory scheme was, therefore, to render the purchase money status of a security interest in a motor vehicle irrelevant given that the priority of competing liens is determined solely by the notations appearing on the vehicle's certificate of title and not by special priority and perfection rules regarding purchase money security interests."  *Graupner*, 356 B.R. at 919.  But precisely *because* the perfection scheme—the same scheme as enacted in Texas—makes the purchase money status of the lien

-15-

*irrelevant*, the Certificate of Title Act has *nothing to say* about the purchase money status of the lien. It thus offers no assistance to our interpretative task because it does not concern the same subject matter, or have the same object or purpose. What is more, even if it *were* a candidate, it would offer no assistance, because it does not address the question of what constitutes the a purchase money security interest, much less what constitutes the precise question with which we are dealing here, namely, what is included in the "price of the collateral." It thus does not conflict with Article 9.103 of the UCC as enacted in Texas.

FMC has also argued that the court should look to Chapter 348 of the Texas Finance Code as another candidate for *in pari materia*. That chapter regulates Motor Vehicle Installment Sales contracts. FMC claims that the definition of "principal balance" in section 348.006 of the Finance Code should inform the court's interpretation of "price of the collateral" as used in section 9.103(a)(2) of the Texas Business and Commercial Code, when applied to a consumer's purchase of a motor vehicle.

FMC admits that the Finance Code never actually uses the term "purchase money security interest." In fact, the chapter does *not* in any meaningful way address the question of security interests, their nature, or their extent. Instead, the Finance Code addresses the unique issues regarding what may be financed, how finance charges are to be computed, and how financing and charges are to be disclosed to retail purchasers of motor vehicles. In short, it is a consumer protection statute. *See Ford Motor Credit Co. v. Blocker*, 558 S.W.2d 493, 497-98 (Tex. Civ. App.—El Paso, 1977, writ ref'd n.r.e.) (predecessor statute's purpose was to protect buyers by preventing abusive and deceptive trade practices by both sellers and creditors of motor vehicles in ordinary credit transactions); *O.R. Mitchell Motors, Inc. v. Bell*, 528 S.W.2d 856, 859-60 (Tex. Civ.

App.—San Antonio 1974, writ ref'd n.r.e.) (purpose of predecessor statute was to impose duties on sellers or persons who, in ordinary course of business, present a buyer a document ready for buyer's signature).  Moreover, section 348.008(b) of the Finance Code itself states that "[e]xcept as provided by this chapter, an applicable statute, including Title 1, Business and Commerce Code [*i.e.*, the Uniform Commercial Code as adopted in Texas], or a principle of common law continues to apply to a retail installment transaction unless it is displaced by this chapter."  TEX. FIN. CODE, § 348.008(b) (Vernon 2006).

The statute *does* contain an extensive discussion of "price," not so much in the context of what may be secured, but rather, in the context of what may be financed when a consumer purchaser buys a motor vehicle and finances it as part of that purchase transaction.  Bearing in mind that the statute's primary purpose differs from that of the UCC, it is nonetheless fair to say that it *does* deal with essentially the same subject matter, at least insofar as how one determines the "price" of a vehicle for financing purposes.  But far from conflicting with the UCC, it harmonizes with it.  If anything, in fact, chapter 348 of the Finance Code supports the conclusion that "price of the collateral" in all likelihood does *not* include monies advanced to pay off negative equity.

Section 348.006 is the section in Chapter 348 that defines what may be included in the "principal balance," for financing and disclosure purposes.  FMC wants the court to equate "principal balance" in this section with "price of the collateral" as used in the UCC, but the structure of section 348.006, if anything, demonstrates that the two concepts should *not* be equated.[12]  Subsection

_____

[12] For ease of reference, here is the statute, in relevant part:
(a) The principal balance under a retail installment contract is computed by:
    (1) adding:
        (A) the cash price of the motor vehicle;
        (B) each amount included in the retail installment contract for an itemized charge; and
        (C) subject to subsection (c), a documentary fee ...; and

-17-

348.006(a)(1) defines what items are includable in the total "principal balance" of a retail installment contract. The first item on the list is the "cash price of the motor vehicle," a number readily identifiable as the price of the vehicle itself. TEX. FIN. CODE § 348.006(a)(1)(A). If there were any doubt about that conclusion, "cash price" is itself a defined term in Chapter 348. Section 348.004(a) defines it as "the price at which the retail seller offers in the ordinary course of business to sell for cash the goods or services that are the subject of the transaction." *See* TEX. FIN. CODE § 348.004(a).[13] *After* "cash price of the motor vehicle," the statute says that the principal balance may *also* include each amount for "an itemized charge," an acknowledgment that the "principal balance" may include other items *in addition to* the "cash price of the vehicle." *See id.* § 348.006(a)(1)(B). One can quickly see from structure of subsection (a), then, that "principal balance" is certainly not equivalent to "cash price of the motor vehicle," lending support to the conclusion that it is also not equivalent to "price of the collateral" as used in article 9.103 of Texas' version of the UCC.

Even more telling for the facts of our case is that negative equity financing is nowhere mentioned in subsection (a). It is also nowhere mentioned in the definition of "cash price" in section 348.004. In fact, it is only indirectly referenced in a *separate* subsection (b) of section 348.006.[14]

---

(2) subtracting from the results under Subdivision (1) the amount of the retail buyer's down payment in money, goods, or both.
(b) The computation of the principal balance may include an amount authorized under Section 348.404(b). TEX. FIN. CODE, § 348.006(a), (b).

[13] Section 348.004 further elaborates that "cash price" may include (at the seller's option) accessories, services related to the sale, the cost of service contracts, taxes, and fees for license, title and registration. *Id.* § 348.004(c). That listing favorably compares to the types of items suggested in Comment 3 to section 9.103 of the UCC as items that might be thought to be includable in the notion of "price" as used in section 9.103(a)(2).

[14] Section 348.006(b) directs the reader to another part of Chapter 348, dealing with disallowed "kickbacks," and the statute's authorized exceptions. Section 348.403 says that a retail seller "may not promise to pay, pay, or otherwise tender cash to a retail buyer as part of a transaction" unless authorized in Chapter 348 itself. TEX. FIN. CODE, § 348.403. One of the exceptions is set out in the next section, permitting a retail seller to advance money to retire an amount owed against a motor vehicle used as a trade-in. TEX. FIN. CODE, § 348.404(b)(1). Here is the first reference to authorization even to pay off negative equity. Subsection (b) of section 348.006 then allows the principal balance to be financed to include this item,

-18-

The Finance Code thus allows *financing* for the payoff of negative equity from the trade-in to be included in the principal balance—but not in subsection (a), where the term "cash price" is found. Instead, negative equity is listed indirectly in subsection (b), *after* a "toting-up" of items more logically connected to the price of the vehicle itself (cash price of the vehicle, plus itemized charges of the sort that could, at the seller's option, be included in the cash price of the vehicle, plus a document fee relating to putting together the retail installment contract, and less the down payment). *Compare* TEX. FIN. CODE § 348.006(a) *with id.* § 348.006(b).  In other words, *in addition* to authorizing the financing of the net cost of the vehicle after subtracting the down payment, the statute *separately* authorizes inclusion in the principal balance the amount used to pay off negative equity from the trade-in.  *See id.*  Were this second item thought by the legislature to be part of the *price* of the vehicle, one would have expected it to have been included as a third item under subsection 348.006(a), rather than as a separate item under its own subsection (b).  The structure of section 348.006 employed by the Texas Legislature thus favors the debtors' view rather than FMC's—a retail installment contract may include (and properly disclose) financing for two separate items: (1) the price of the vehicle being purchased, and (2) the cost of paying off any negative equity from the trade-in.  That, in turn, favors a conclusion that "price of the collateral," roughly equivalent to "cash price of the motor vehicle," does not include the amount advanced to pay off negative equity, even though that amount is allowed to be financed.

This analysis of the structure of section 348.006 takes on additional force when we recall the primary purpose of the Motor Vehicle Installment Sales chapter in the Finance Code—to regulate retail sellers, both for the protection of the buyer *and* the protection of any entity that may ultimately

---

effectively authorizing the dealer to pass the cost of advancing money to retire the negative equity onto the buyer.

purchase the retail installment sales contract from the retail seller (such as, for example, Ford Motor Credit). From a disclosure point of view, both buyers and financers want to know how much of the ultimate balance to be paid over time is actually derived from the price of the vehicle being purchased, and how much is derived from other costs and charges associated with the transaction. That very differentiation cuts against the claim by FMC that "principal balance" should be construed to mean essentially the same thing as "price of the collateral."

Texas' Code Construction Act counsels that the *first* step in applying the doctrine of *in pari materia* (assuming the court has found that the prerequisites for its use have otherwise been met) is to determine whether different statutory provisions even conflict. *In re J.R.M.*, 149 S.W.3d at 292; TEX. GOV'T CODE, § 311.026(a) (Vernon 2005) ("*If* a general provision *conflicts* with a special or local provision, the provisions should be construed, if possible, so that effect is given to both.") (emphasis added). If such a conflict is found, the next step is for a court to harmonize the two so as to give effect to both, if possible. The foregoing analysis demonstrates that there is no conflict presented here between the Finance Code's use of "cash price" and the UCC's reference to "price of the collateral." To the contrary, the two statutory enactments are remarkably complementary. Even were one to imagine a conflict (and one would have to be driven to arrive at one's conclusion in order to get there, in this court's view[15]), the two provisions are easily harmonized. The more sensible (and harmonizing) conclusion is that "price of the collateral" as used in the UCC corresponds with "cash price" as used in the Finance Code. Without a conflict, it is not only unnecessary but inappropriate to resort to the "specific over general" rule.

---

[15] It is a logical fallacy for one to presume one's conclusion in order to reach it. Here, FMC commits that fallacy, by first presuming that "principal balance" as used in the Finance Code means the same thing as "price of the collateral" as used in the Uniform Commercial Code. There is no factual, legal, or logical reason to make that presumption, however.

If we are to resolve the question of what should and should not count as includable in the "price of the collateral" as used in the context of consumer purchases of motor vehicles, then, the doctrine of *in pari materia* offers little assistance, other than to confirm that "price of the collateral" does not include negative equity. There appears to be a close correspondence between the Finance Code and the UCC on how to think about the notion of "price of the collateral," as distinct from other items that might also be financed and secured. Absent resort to that doctrine, we must look to other, more conventional sources for guidance. *See* TEX. GOV'T CODE, § 311.003 (Vernon 2005) (Code construction rules are not exclusive, and are offered primarily to guide construction).

One long-held rule of construction in Texas, to borrow from the observation of another Texas bankruptcy court, is that courts are to be governed by rules of common sense. *In re Amber's Stores, Inc.*, 205 B.R. 828 (Bankr. N.D.Tex. 1997); *see also Fitzgerald v. Advanced Spine Fixation Systems, Inc.*, 996 S.W.2d 864 (Tex. 1999) (answering a certified question by counseling that Texas courts should construe statutes by first looking to the plain and common meaning of the statutory language); *Bouldin v. Bexar County Sheriff's Civil Service Comm'n*, 12 S.W.3d 527 (Tex. App.—San Antonio 1999) (instructing that words in a statute have their ordinary meaning unless the statute defines them or they are connected with or used with reference to a particular trade or subject matter or are a term of art); *Ex parte Anderson*, 902 S.W.2d 695 (Tex. App.—Austin 1995) (noting that, absent special definitions, language attacked as vague is to be measured under common understanding or practices or construed in the sense the language is generally understood). While reasonable minds could dither over whether "price of the collateral" ought to include accessories or the tax, title, and license fees associated with the purchase of the vehicle in question, the person on the street might be surprised to learn that a court had concluded that the cost of paying off the excess loan on the trade-in also

-21-

counts as "the price" of the vehicle itself. Once the transaction is teased apart, it becomes readily obvious that a portion of this loan is actually an advance (in legal effect to the debtor, but in practical effect to the dealer) to pay off the negative equity from the trade-in. Retiring this overhang from the old vehicle may effectuate the transaction, but effectuating the transaction does not make this portion of the transaction part of the purchase price of the new vehicle that the debtors in this case purchased. Indeed, Chapter 348 of the Finance Code supports this economic view of the transaction. Section 384.404(b), the subsection said the permit the payoff of negative equity as part of the principal balance, describes the transaction as the financing of monies advanced by the retail *seller* (*i.e.*, the dealer) to pay off amounts owed against a motor vehicle used as a trade-in. *See* TEX. FIN. CODE, § 348.404(b)(1); 348.006(b).

The context of the phrase "price of the collateral" as used in section 9.103(a) lends further credence to this straightforward reading. Context, of course, is important. *See J.B. Advertising, Inc. v. Sign Bd. of Appeals of Carrolton*, 883 S.W.2d 443 (Tex.App.—1994, pet. denied) (reading words in context, and construing them according to rules of grammar and common usage). The phrase is used to help define "purchase money security interest," and does this by being employed within the definition of "purchase money obligation." *See* TEX. BUS. & COMM. CODE § 9.103(a)(2). That the legislature needed to define the obligation with a limiting expression, *i.e.*, debt attributable to the price of the collateral, carries with it the implication that the legislature understood that some part of the overall obligation for which security might be taken might *not* be debt attributable to the price of the collateral. *See id.* ("all *or part of* the price of the collateral") (emphasis added). FMC's argument would seem to be that, if the same lender lent the money, and took a security interest in the vehicle the borrower is buying, then perforce all the debt must be the price of the collateral. The

context of the statute suggests otherwise, however. In defining debt that *is* attributable to the collateral's purchase price, the legislature tacitly expresses its understanding that some part of the debt secured by the collateral might be for things *other than* the acquisition price of the collateral itself.

Further support for this contextual reading can be found in section 9.103(f), which explains that (in the non-consumer goods situation), a purchase money security interest does not necessarily lose its status simply because the collateral in question also secures an obligation that is *not* a purchase money obligation. *Id.* at § 9.103(f)(1). Section 9.103(a) offers definitions to be used in the *entirety* of section 9.103—including section 9.103(f)(1). There was thus a clear understanding on the part of the drafters that the entirety of a given obligation proposed to be secured by the goods purchased might *not* necessarily constitute the "purchase money obligation" as defined in section 9.103(a)(2). Context thus bolsters the conclusion that "price of the collateral" need not be given some exotic meaning or treated as some peculiar argot to sweep up more than the common understanding of the phrase is intended to convey. One may borrow money to buy something (*e.g.*, a new vehicle), and also borrow additional money for some other purpose (*e.g.*, to pay off the balance of a loan for the trade-in vehicle). The part used to buy something is purchase money obligation. The part used for some other purpose is not. We can tell what part was used to buy something by simply looking at the price of the thing purchased. Were this a non-consumer transaction, no one would need to strain at these straightforward observations, in part because the UCC itself offers shelter for what is a common financial transaction. It is only because section 9.103(f) offers no shelter for consumer goods transactions that we are invited here to enter an alternative reality where ordinary words no longer mean what they say. Prudent statutory

-23-

construction rules pull us safely back to reality, fortunately. While this court declines to say with finality what "price of the collateral" *is* (much as the authors of Comment 3 declined to take such a stand),[16] the court is comfortable in concluding that, in the context of the retail sale and financing of a motor vehicle to a consumer, "price of the collateral" does *not* include the amount financed to pay off the negative equity from the vehicle traded in.

### Are Funds Used to Pay Off Negative Equity "Value Given to Enable the Debtor to Acquire Rights In the Collateral?"

Our quest for the meaning of "purchase money security interest" does not end here. The definition of "purchase money obligation" which forms the critical foundation for what counts as "purchase money" also means "an obligation incurred . . . for value given to enable the debtor to acquire rights in . . . the collateral if the value is in fact so used." TEX. BUS. & COMM. CODE § 9.103(a)(2). FMC has argued that this phraseology means something different from or in addition to "the price of the collateral." According to FMC, only if the retail seller was willing not only to take the debtor's old vehicle in trade but also to pay off the negative equity on that vehicle would the debtor have been able to buy the new vehicle. Thus, says FMC, paying off the negative equity enabled the debtor to acquire rights in the vehicle being purchased.

The argument, of course, is not without force. However, it once again proves too much. By this logic, were the dealer prepared to pay off some of the debtor's credit card debt to help the debtor qualify for the car loan, that too, following FMC's logic, would be "value given to enable the debtor to acquire rights in the vehicle," as the debtor could be said not to be able to obtain the financing necessary to buy the vehicle unless other debt was first paid down. One needs only a few

---

[16] Recall that Comment 3 counsels, "As used in subsection(a)(2), . . . the 'price' of the collateral or the value given to enable . . . *includes* . . . ." TEX. BUS. & COMM. CODE, § 9.103, Comment 3.

imaginative moments to think of other examples so far afield that even FMC would have to eventually admit that the formulation would effectively drain "purchase money" of any valid meaning.[17]

But what, then, does "value given to enable" mean? Comment 3 to section 9.103 offers some guidance. The comment, in pertinent part, reads:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

TEX. BUS. & COMM. CODE, § 9.103, Comment 3. In listing the types of obligations that might be includable, the comment seemingly *equates* "price" with "value given to enable." The drafters of

---

[17] The court is reminded of Justice Rehnquist's criticism of Justice Breyer's dissent in *U.S. v. Lopez*, which had suggested that a federal law criminalizing possession of a firearm within so many feet of a school was a legitimate exercise of Congress' power to legislate on matters affecting interstate commerce. *See U.S. v. Lopez*, 514 U.S. 549, 629, 115 S.Ct. 1624, 1664 (1995) (Breyer, J., dissenting). Said Justice Rehnquist in his critique:

> Justice BREYER rejects our reading of precedent and argues that "Congress . . . could rationally conclude that schools fall on the commercial side of the line." [] Again, Justice BREYER's rationale lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "fall[ing] on the commercial side of the line" because it provides a "valuable service – namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." . . . .
>
> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. . . . To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, []and that there never will be a distinction between what is truly national and what is truly local,[]. This we are unwilling to do."

*Lopez*, 514 U.S. at 565-68, 115 S.Ct. at 1633-34 (internal citations omitted). Justice Rehnquist's logic brought sense and order back to the ordinary usage of the English language by reminding us that the Court's formulation of the test requires a showing of *substantial* impact on *interstate commerce*. We are wise to apply Justice Rehnquist's practicality in the present context as well, lest we turn legal analysis into sophistry.

the Uniform Commercial Code, in other words, saw these two expressions as describing essentially the same concept, though from different viewpoints, with "price" being from the point of view of the buyer and "value given to enable" being from the point of view of the financer.

The principle of *ejusdem generis*, applied to the listing in the comment, also cuts against inclusion of the payoff of negative equity on the trade-in vehicle. The items listed are closely connected with the purchase of the vehicle itself—compensating the seller for the cost of delivering the vehicle, repaying the seller for sales taxes realized from the sale of the vehicle, paying for such related administrative charges as title costs and license fees associated with transferring ownership of the vehicle from seller to buyer, and the like. In addition, the list includes costs normally associated with the enforcement of the security interest once granted—attorneys' fees, collection and enforcement costs, and the like. FMC would have the court read into the generic first item "obligations for expenses incurred in connection with acquiring rights in the collateral" an item—that is, the payoff of negative equity—wholly out of keeping with the nature of the other specific items listed. That violates the *ejusdem generis* rule of statutory construction, a rule appropriately employed when reading comments to uniform enactments. *See, e.g., Wesbart & Co. v. First Nat'l Bank of Dalhart, Tex.,* 568 F.2d 391, 395 (5th Cir. 1978) (applying the doctrine to "sale, exchange, or other disposition," found in section 9.306 of the UCC as enacted at that time).

The language of section 9.103(a)(2) also counsels against construing "value given" as broadly as FMC suggests. The statute itself says that the value given must be "in fact so used." The fair implication of this conditional is that the value must be used to acquire *rights* in the collateral, as opposed to, for example, *enabling the transaction* that ultimately results in the borrowers acquiring rights in the collateral. While not precisely on point, a Texas case supports this reading. *See First*

*National Bank in Munday v. Lubbock Feeders, L.P.*, 183 S.W.3d 875 (Tex. App.—Eastland 2006, pet. denied).  That court there was asked to decide whether the loan in question "enabled" the debtor to acquire the collateral in question—in that case, cattle—such that the resulting security interest would qualify as purchase money under this section.  The facts upon which the court relied to conclude that the loans in question in fact fit this standard were that (1) the lender made money advances to the borrower relating specifically to the acquisition of a specific set of cattle (the collateral in question), that (2) in fact the borrower purchased the cattle in question prior to actually receiving the proceeds of the loans, but that (3) the tracing of the loan proceeds to the actual collateral acquisition was sufficient to conclude that the loans "enabled" the purchase of the cattle in question.  *See id.* at 882-883.  The key consideration, said the court, was not the timing, but rather whether the loan "enable[d] the debtor to acquire rights in the collateral."  *Id.*, at 883.  Critical for our purposes is the length to which that court went to tie the proceeds of the loan to the actual acquisition of the very cows claimed as collateral.  Following a similar logic, it is also easy here to trace what portion of the loan proceeds went to the actual acquisition of the Ford Explorer, and what portion was used for another purpose, namely, to pay off an old loan.  No doubt the payoff of the old loan facilitated the *transaction*, but we can easily tell what part of the loan actually "enabled" the debtor to acquire rights in the collateral itself, in the sense discussed by the court of appeals in *First National Bank in Munday*.[18]

---

[18] The court of appeals cited with approval to an appellate decision from New York that discussed the history and purpose of the predecessor statute to current section 9.103, section 9.107 of old Article 9 of the UCC.  *See General Elec. Cap. Comm. Automotive Fin., Inc. v. Spartan Motors, Ltd.*, 246 A.D.2d 41, 675 N.Y.S.2d 626 (1998).  That court in turn explained that section 9.107 was designed to liberalize prior practice, which had required that, for a given security interest to count as "purchase money," timing was everything.  Thus, for example, if the funds happened to be advanced *before* the purchase, then, under prior law, the resulting security interest would not qualify as purchase money.  *Id.* at 47-50.  Neither chronology nor configuration of the cash flow would, under section 9-107 be dispositive, but a court would still have to test for whether the loan transaction were "closely allied" to a purchase to qualify for purchase money status. *Id.* at 48.  That in turn would required an inquiry into the intent of the parties to the transaction.  *Id.*  Said the court, "In assessing the relationship of the

Comment 3 also counsels that the concept "purchase money security interest" requires a *close nexus* between the acquisition of the collateral and the secured obligation, comporting nicely with the analysis pursued by the court in *First National Bank in Munday* (and in the cases upon which it relied). *See id.*; *see also* TEX. BUS. & COMM. CODE § 9.103, Comment 3. While the example offered is one in which there is a temporal break between the acquisition of the collateral and the other indebtedness secured, the reason for that particular example is rooted in the history of the development of this section. *See supra* note 18. As carefully explained by the appellate court in *General Electric Capital Automotive Finance v. Spartan Motors, Ltd.*, upon which the Texas court of appeals relied, the real task is to see whether the loan in question is "closely allied" with actually paying for the items purchased. *See General Elec. Cap. Comm. Automotive Finance, Inc. v. Spartan Motors, Ltd.*, 246 A.D.2d 41, 48, 675 N.Y.S.2d 626, 632 (N.Y.App. 1998). Following that approach once again leads us to the conclusion that the enabling language used in the definition of "purchase money obligation" is intended to tie the loan made to the collateral acquired by showing that the borrower used the money to buy the collateral itself.

Of course, some courts have reached a different conclusion, and FMC relies specifically on two of those decisions. *See In re Cohrs,* 2007 WL 2050980 at *3 (Bankr. E.D. Cal. June 25, 2007) ("This court reads [section 9-103] and Note 3 to require only a 'close nexus' between the acquisition of the property and the secured obligation. That is, it must be part of a *single transaction* and *all components of the obligation* incurred must have been for the purpose of acquiring the property securing the new obligation.") (emphasis added); *see also In re Graupner II*, 2007 WL 1858291 at

---

transactions, the test should be whether the availability of the loan was a factor in negotiating the sale, and/or whether the lender was committed at the time of the sale to advance the amount required *to pay for the items purchased.*" *Id.* (emphasis added).

*2 (M.D. Ga. June 26, 2007).  These courts come to the same conclusions that, without the negative

equity rolled into the deal, the overall package transaction could not occur.  They then conclude, on

that basis alone, that the negative equity must be value given to enable the debtor to acquire rights

in the collateral.  This line of reasoning, however, obscures the distinction between enabling a

*transaction* to occur and enabling a debtor to acquire *rights* in new collateral, the test imposed by

the statute itself and its interpretive comment.  For example, in *In re Cohr*, the court concluded that

the debtor's old vehicle "was traded in to the seller as part of the value given to acquire the new

vehicle."  *In re Cohr*, 2007 WL 2050980 at *3.  The court in *In re Graupner II* concluded that the

inextricable intertwining of the negative equity in the sales transaction confirmed a "close nexus

between the negative equity and this package transaction."  2007 WL 1858291 at * 2.  The logical

fallacy of this reasoning is obvious.  Both courts presumed their conclusion in order to reach it.

Comment 3 of section 9.103 counsels against such a conclusion.  The UCC does not require

a close nexus between a part of the transaction (*i.e.,* the negative equity) and the transaction itself.

What is required is a close nexus between the acquisition of collateral (*i.e.,* the new vehicle) and the

obligation tied directly to the collateral (*i.e.,* the funds going toward the purchase of the new vehicle).

While this court does not deny that the negative equity was a crucial part of the transaction that

brought both parties to the table, it is simply not the case that the portion of the loan that paid off the

negative equity from the trade-in has a "close nexus" to the acquisition of the new vehicle itself.

Enabling a transaction to occur does not, of itself, establish a close nexus between the acquisition

of collateral and the secured obligation.  The court respectfully declines to be guided by what it

deems to be the too-facile conclusion reached by the courts upon which FMC relies.

It is clear that this transaction entailed giving more value than was necessary for the debtor

-29-

to acquire rights in the new vehicle.  All that was required for the debtor to actually acquire rights in the new vehicle was value sufficient to pay for the new vehicle.  Clearing the title on the old vehicle is a separate matter, one which redounded to the benefit of both the debtor purchaser and the dealer seller.  This part of the transaction is value given by the debtor to the dealer, but it was clearly not used to acquire rights in the new collateral—it was used to pay off the balance on the old vehicle, to the ultimate advantage of the dealer seller.  *Compare* TEX. FIN. CODE, § 348.404(b) (permitting a retail *seller* to pay off the negative equity on a trade-in vehicle); *id*., § 348.006(b) (allowing the amount advanced by the *seller* to pay off the negative equity on the trade-in vehicle to be reimbursed by the purchaser, and financed as part of the principal balance).  There is no doubt that this is a cost incurred by the dealership, without which the transaction could not have occured.  However, it is not a cost contemplated by the UCC as one that is part of the purchase money obligation.  *See* TEX. BUS. & COMM. CODE § 9.103, Comment 3.  Instead, it is an obligation of the debtor to the dealership reimbursing the dealership for paying off the balance on the old vehicle.

The funds used to pay off the negative equity in the vehicle traded-in are neither part of the price of the collateral, nor are they value given by FMC that was actually used to enable the debtors to acquire rights in the collateral.  These funds merely enabled the dealership to pay off the balance on the trade-in using the debtors' credit.  As a result, that part of the loan attributable to the negative equity from the debtors' old vehicle is not part of the purchase money obligation as defined by section 9.103(a)(2) of the Texas Business and Commercial Code.

### *How Does a Creditor Qualify for Protection Under § 1325(a)(*)?*

Now that we know that the "negative equity" portion of FMC's loan to the debtors is not part of FMC's purchase money security interest (*i.e.*, it is secured, but the security interest is not a PMSI

security interest within the meaning of section 9.103 of the UCC),[19] we next need to determine how or whether FMC's claim fits within the 910-day exception to the general rule that secured claims can be bifurcated in a Chapter 13 plan.

It is at this point that many courts begin to discuss whether a transformation rule or a dual status rule should apply to the creditor's purchase money security interest. *See, e.g., In re Westfall*, 2007 WL 2777709 at *8 (supplementing its previous order, holding that the transformation rule is "too severe," and allowing the debtor to treat only the non-purchase money portion of the creditor's claim attributable to the payment of negative equity as an unsecured claim); *Citifinancial Auto v. Hernandez-Simposon (In re Hernandez-Simpson),* 369 B.R. 36 (D. Kan. 2007) (holding that the dual status rule applies because the Kansas enactment of the UCC specifically excluded subsection (h) from 9-103 and the applicable paragraphs from the Official Comment, resulting in the all out rejection of the transformation rule for all transactions).  But with all due respect to these courts, this analysis begins in the wrong place.  The application of the dual status and transformation rules are appropriate in the non-bankruptcy context when deciding (under state law) whether and to what extent a creditor retains a purchase money security interest when part of the consumer debt is a non-purchase money obligation.

Our task is different.  Our task is to determine whether FMC qualifies for the special protection afforded certain creditors under the 910-day provision of the Bankruptcy Code, a question of federal law.  For that task, state law rules regarding the application of either the transformation rule or dual status rule are simply irrelevant.  Indeed, it will be recalled that section 9.103(h) and the

---

[19] Recall that security interest in goods is a purchase money security interest to the extent that the goods are purchase money collateral with respect to that security interest.  TEX. BUS. & COMM. CODE § 9.103(b)(1).  Additionally, "purchase money collateral" means goods that secure a purchase money obligation incurred during the acquisition of the collateral.  *See id.* § 9.103(a)(1).

relevant Official Comments of the Texas Business and Commercial Code confirm this notion. *See* Tex. Bus. & Comm. Code § 9.103(h) *and id.*, Comment 8. We looked to state law to understand the common meaning of a particular term which was otherwise undefined by the Bankruptcy Code. We did so because accepted rules of statutory construction employed by *federal* courts counsel us to do so. Once that task has been completed (as it has been here), we must then return to our original task, that of divining the correct interpretation of the statutory language enacted by Congress in the hanging paragraph appended to section 1325(a).

Armed with what we believe to be an accurate understanding of the meaning of "purchase money security interest" as used in the hanging paragraph, our next task is to examine the language of the federal enactment itself. If that language is sufficiently clear and unambiguous, then under a "plain meaning" rule of construction, we should be able to parse Congress' intentions. The precise language of the 910-day provision itself is where we thus must begin.

Here, again, is what the statute says, highlighting the operative language relevant to our inquiry:

> For the purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph *if the creditor has a purchase money security interest securing the debt that is the subject of the claim*, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for the debt consists of a motor vehicle. . . ."

11 U.S.C. § 1325(a)(*) (emphasis added). The paragraph self-describes its provisions as an exception to the general rule for secured claims set out in section 1325(a)(5), which allows bifurcation of such claims by means of section 506(a) (which state that a claim in bankruptcy is secured only to the extent of the value of the collateral). *See Scarborough v. Chase Manhattan Mortgage,* 461 F3d 406, 410 (3d Cir. 2006) (discussing how the antimodification provision of

section 1322(b)(2), like the 910-day provision of section 1325(a)(*), carves out a narrow exception

to an otherwise general rule). Exceptions to general rules are construed narrowly. *Scarborough*, 451

F.3d, at 411; *see also In re LaFata*, 483 F.3d13, 20-21 (1st Cir. 2007).

So to what narrow class of creditor claims does this exception apply? The statute tells us that

the vehicle must have been purchased within 910 days of the bankruptcy filing (a fact regarding

which there is no dispute in this case), and that the vehicle must have been purchased for the

personal use of the debtor (an issue not raised in this case). In addition, the exception only applies

"*if* the creditor has a purchase money security interest securing *the debt* that is the subject of the

claim." *See* 11 U.S.C. § 1325(a)(*) (emphasis added). We know on the facts of this case that FMC

has a purchase money security interest that secures *part of* the debt. Is that sufficient to qualify FMC

for the narrow exception? In the opinion of this court, the short answer is "no."

The first thing to note about the above-quoted language is the use of the word "if" as a

conditional.[20] The word "if" implies that the purchase money collateral either secures the debt

underlying FMC's claim or it does not. Congress could have used different language, such as "to

the extent of" or "the extent to which" had it intended that the 910-day rule apply to that portion of

the debt that is PMSI, as is the case here. But it did not. Congress certainly knows how to employ

"to the extent" language when a sliding-scale result is intended. For example, section 506(a) of the

Bankruptcy Code allows for the bifurcation of claims *to the extent of* the value of the underlying

collateral securing the claim. *See* 11 U.S.C. § 506(a) (emphasis added). For another example,

section 522(f) contains similar "to the extent" language, permitting avoidance of a non-purchase

---

[20] Recall that "[t]he starting point in statutory construction is to read and examine the text of the act and draw inferences concerning the meaning from its composition and structure." 2A SINGER § 47:1 at 274-75.

money security interest in certain consumer goods *to the extent* that the lien resulting from the security interest impairs a debtor's ability to claim an exemption.  *See id.* § 522(f)(2) (emphasis added); *see also Croomer v. Barclays Am. Fin. (In re Croomer),* 8 B.R. 351, 353 (Bankr. E.D. Tenn. 1980) (noting that the language of former UCC section 9-107(a) called for the dual status rule because of its "to the extent" language).  But Congress did not use "to the extent" language in the hanging paragraph to section 1325(a).  Congress instead chose to include a simple conditional—"if." The inclusion of "if" must be construed as the intentional exclusion of "to the extent."  *See* 2A SINGER § 47:23 at 412-13.

The second thing to note is that the "if" conditional is applied to "*the debt* that is the subject of the claim."  *See* 11 U.S.C. § 1325(a)(*).  The statute thus requires "the debt" to be secured by a PMSI—not "a part of" the debt or "any portion of" the debt or "that portion of" the debt, all phrases that would deliver very different outcomes.  Once again, Congress is deemed to have intended the plain meaning of the language it employed.  It certainly could have included phrases like "a part of," "any portion of," "that portion of" or even "to the extent that."  But Congress did not include those phrases or any others that could be construed to provide broader protection.

The 910-day provision is clear and unambiguous.  It requires the creditor to hold a purchase money security interest securing the debt—not part of the debt, not any part of the debt, not that portion of the debt, but *all* of the debt that is the subject of the claim.  "Debt" is a defined term in the Bankruptcy Code.  It means liability on a claim.  *See id.* § 101(12).  Claim in turn is also defined in the Code.  It means a right to payment.  *See id.* § 101(5).  And because the very intention of the hanging paragraph is to *exclude* the application of section 506(a) (a provision which bifurcates the claim), it should be abundantly clear that "the claim" as used in the hanging paragraph means *the*

*whole claim*, not just some part of it. As "claim" and "debt" are synonymous in the Code, the Code's use of the phrase "*the* debt" means *the entire debt*.

Congress could certainly have drafted this provision to cover a broader class of creditors had it so intended. Congress has done so in other provisions. *See, e.g., id.* § 507(a)(7) ("to the extent of . . ."), § 507(a)(8) ("to the extent that such claims are for . . ."), § 1322(b)(8) ("all or part of a claim . . ."), § 1322(f) ("any amounts. . ."). It did not do so here, and there is no compelling reason for the court to shrink from the plain import of the statute as written. Congress is presumed to have said what it meant, and to have meant what it said. *See* 2A SINGER § 46:1 at 141-43 (citations omitted).

Thus, *if* the creditor has a PMSI securing its debt (*i.e.*, the entire debt), and the other prerequisites are present, the creditor will qualify for the narrow exception set out in the hanging paragraph. If the creditor has something less than that (as is the case here), then the creditor does not qualify for the narrow exception, and the general rule set out in section 1325(a)(5) will apply. FMC does not qualify for the narrow exception set out in the 910-day provision, because not all of the debt is secured by a PMSI. Some of the debt, the portion attributable to financing the negative equity on the trade-in, though secured, is not secured by a PMSI. Because there is a portion of FMC's claim that is not secured by its purchase money security interest, the claim is not the type of claim described in section 1325(a)(*) of the Bankruptcy Code as protected from bifurcation and cram down.[21]

---

[21] While this result appears to be the same as though a transformation rule applied to FMC's security interest, there is a subtle distinction here. The all-or-nothing rule we apply today is derived from the plain language of the Bankruptcy Code itself. It does not come from an interpretation of the UCC or an application of the transformation rules developed in state decisional law. The plain language of the Code simply requires all of the creditor's claim be secured by the creditor's purchase money security interest. Aside from our understanding of the common meaning of "purchase money security interest," for which we looked to the UCC, nothing else in the 910-day provision instructs us to consult state law for a

This is not the first time Congress has carved out an exception to protect a certain type of creditor in a Chapter 13 plan. The 910-day exception to bifurcation has several similarities to another exception to section 1325(a)(5), section 1322(b)(2). There too, the courts have applied a narrow all-or-nothing rule of qualification, and they have done so using the same interpretive tools used here—a straightforward review of the language of the statute itself.

Section 1322(b)(2), it will be recalled, reads as follows:

> [A] plan may modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class claims.

11 U.S.C. § 1322(b)(2) (emphasis added). In *Nobleman v. American Savings Bank (In re Nobleman),* 508 U.S. 324, 331, 113 S.Ct. 2106 (1993), the Supreme Court held that the bifurcation of a claim held by the home mortgagee violated the antimodification provision of section 1322(b)(2) because bifurcation under section 506(a) modified the rights of the mortgagees. However, since *Nobleman,* several other courts have had to decide whether this antimodification provision applied to claims secured by something more than simply the debtor's principal residence. *See, e.g., Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir. 1996); *Scarborough v. Chase Manhattan Mortgage (In re Scarborough)*, 461 F.3d 406 (3d Cir. 2006); *E. Savings Bank, FSB v. LaFata (In re LaFata),* 483 F.3d 13 (1st Cir. 2007). In both *Lomas Mortgage* and *In re Scarborough*, the creditor held a security interest in a multi-unit dwelling, with the debtor residing in one of the units and renting out the rest.

construction of the provision. And even if this court were compelled to consult state law, the state law itself instructs us to look back to the Bankruptcy Code before applying a transformation or dual status rule. *See* TEX. BUS. & COMM. CODE § 9.103(h); *see also id.*, Comment 8. Perhaps it is because the term "purchase money security interest" is undefined in the Bankruptcy Code that it has become the cynosure in this provision, tempting other courts to turn to state law and remain there for an in-depth discussion of the transformation and dual status rules. However, once the undefined term is given its common meaning, the remaining language of the provision keeps our focus on the task at hand—that is determining the qualifications for protection under the 910-day provision as a matter of federal law.

*See generally Lomas Mortgage,* 82 F.3d at 2; *In re Scarborough,* 461 F.3d at 408. While the *Lomas Mortgage* court thought the antimodification provision was ambiguous as applied in the multi-unit dwelling scenario, *see Lomas Mortgage,* 82 F.3d at 4, the *Scarborough* court found the provision both clear and unambiguous. *In re Scarborough,* 461 F.3d at 411.

*Scarborough*, looking at the plain language of the antimodification provision, held that "the real property that secures the mortgage must *be only* the debtor's principal residence in order for the antimodification provision to apply." *Id.* (emphasis in the original). The court recognized that special provisions like the antimodification provision of section 1322(b)(2) are exceptions to otherwise general rules; the antimodification provision is an exception to the remainder of section 1322(b)(2), which allows a Chapter 13 plan to modify the rights of secured creditors. *Id.* at 410. The court also found textual support for its plain meaning interpretation in Congress' use of the word "is" in the expression "real property that *is* the debtor's principal residence." *See id.* at 411 (citing 11 U.S.C. § 1322(b)(2)). The word choice, by negative implication, meant that when a creditor's claim is secured by property that is even in part *not* the debtor's principal residence, it does qualify for the antimodification provision. In *Scarborough*, that left the debtor free to modify the rights of the mortgage creditor. *Id.* Said the court:

> Just as a creditor who takes *any* interest in personal property forfeits the benefit of § 1322(b)(2), so does a creditor whose claim is secured by *any* real property that is not the debtor's principal residence. If a mortgage includes language that "is effective to grant an interest in such collateral, the mortgagee is at its peril in not deleting it."

*Id.* at 411-12 (quoting *In re Fernandos,* 402 F.3d 147, 155 (3d Cir. 2005)) (emphasis in the

original).[22]

The hanging paragraph also carves out a narrow exception to an otherwise general rule. Just as the antimodification provision of section 1322(b)(2) prevents plans from modifying rights of certain home mortgage lenders, the 910-day provision of section 1325(a)(*) prevents plans from cramming down secured claims of certain car lenders. The language of the two provisions is somewhat similar as well. The 910-day provision requires that the "debt *that is* the subject of the claim" be secured by the purchase money security interest in the motor vehicle. 11 U.S.C. § 1325(a)(*). This is comparable to the language in section 1322(b)(2), which requires the mortgagee to hold "a claim secured only by a security interest in real property *that is* the debtor's principal residence." *Id.* § 1322(b)(2). The court in *Scarborough* noted that "is" does not mean "includes." Instead, "is" means that the real estate must be used *only* as the debtor's principal residence. Just as Congress did not use language such as "any portion of" or "part of" to broaden the coverage of the antimodification provision found in section 1322(b)(2), Congress also failed to include similar broadening language in the 910-day provision. *See Scarborough,* 461 F.3d at 411 (citations omitted). Just as the antimodification provision does not apply to home mortgage lenders where *any part* of the real estate is not used for the debtor's principal residence, so also the 910-day provision, as written, applies only if the creditor's purchase money security interest secures *all* of the underlying debt comprising a creditor's claim. If any part of that claim contains non-purchase money debt, such as debt attributable to paying off negative equity from a trade-in, the 910-day provision does not apply to any part of the creditor's claim.

---

[22] Though unnecessary to its conclusion, the *Scarborough* court also noted that both public policy and the legislative intent behind the provision supported its conclusion. *Id.* at 413 (citing *Lomas Mortgage,* 82 F.3d at 4-7, which reached the same holding, but based on its reading of the legislative history to the statute).

Yet, even were the court to find that the language of the 910-day provision is ambiguous and capable of two reasonable interpretations,[23] those two interpretations would be that the 910-day provision applies if (1) the *entire* claim is secured by the creditor's purchase money security interest; or (2) *any part of* the claim is secured by the creditor's purchase money security interest. The slim legislative history[24] to the 910-day provision provides no dispositive support for either interpretation.[25] And even if the legislative history did support one interpretation over the other,

---

[23] "A statute is ambiguous when the text is capable of at least two reasonable readings, or when no one reading is clearly indicated." *In re Teligent, Inc.*, 268 B.R. 723, 733 (Bankr. S.D.N.Y. 2001) (citing 2A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 48:01, at 410 (6th ed. rev. 2000)).

[24] In looking to extrinsic aids for legislative intent behind the enactment of an ambiguous provision, this court notes that courts in general should take caution to avoid considering sources beyond the scope of recognized, traditional tools for statutory construction. For example, statements made by persons regarding failed legislation should not be considered. *See* 2A SINGER §§ 48:1 *et Seq.* at 531-68. Likewise, printed commentaries containing legislation never enacted into law are not binding on courts. History of a statute's enactment is helpful to understand the circumstances under which the statute was passed, the mischief at which it was aimed, and the object it was supposed to achieve. *See id.* § 48:3 at 551-53. However, this court will not consider the motivations of proponents and opponents of BAPCPA outside of what is expressed in the Code itself or any officially recorded comments contained within the Code. External references are uniformly disregarded for the purposes of statutory interpretation. *See id.* § 48:17 at 619-20. Additionally, this court will not consider post-enactment statements, commentaries, and views concerning the legislation. Post-enactment history has little value, if any, in construing a statute or the legislative intent behind the statute. *See id.* § 48:20 at 628.

[25] The new 910-day provision of section 1325(a) first appeared in section 306 of Senate Bill 625. Bankruptcy Reform Act of 1999, S. 625, 106th Cong. § 306(b) at 97 (1999). The text of the proposed amendment was essentially the same as it appears in section 1325(a)(*) today. The title of subsection (b), in which the amendment appears, is "Restoring the Foundation for Secured Credit." *Id.* at 96-97. The title of section 306 is "Giving Secured Creditors Fair Treatment in Chapter 13." *Id.* Section 306 appears is Title II, which is labeled "Discouraging Bankruptcy Abuse." *See id.* at 2. For the most part, this language did not change over the course of the next six years. The first bill contained a five-year look back period for motor vehicles and a six-month look back period for all other collateral. The subsequent Senate Bill, introduced on September 22, 2000, included necessary commas and changed the six-month period for other collateral to the one-year period that it is today. *See* S. 3186, 106th Cong. § 306(b) at 135 (2000). The House of Representatives finally incorporated this provision in House Bill 333, which contained the exact language of Senate Bill 3186 with the exception of a three-year look back period for the acquisition of motor vehicles. H.R. 333, 107th Cong. § 306(b) (2001). Senate Bill 220, introduced that same year, did not incorporate the three-year period from the House Bill. *See* S. 420, 107th Cong. § 306(b) at 135 (2001).

The well-known "910-day" language was not introduced into the legislation until House Bill 5744 was introduced on November 24, 2002, which left the remaining text of the proposed amendment exactly how it appeared before and exactly how it appears in section 1325(a)(*) today. *See* H.R. 5744, 107th Cong. § 306(b) at 145 (2002). The "910-day" period was incorporated into the 2005 version of a Senate bill—the same Senate Bill 256 that was signed into law as Public Law 108-9 on April 20, 2005. *See* S. 256, 108th Cong. § 306(b) (2005). This is the extent of the relevant legislative history found for the paragraph now known as section 1325(a)(*), the 910-day provision, or the hanging paragraph. With the exception of the aforementioned subtitles, this court finds no dispositive statements or evidence resolving the ambiguity at issue. While titles are helpful to a certain extent, *see* 2A SINGER § 47:3 at 284-90 ("Since the title of the act is . . . itself a legislative expression of the general scope of the bill, it is proper to consider it in arriving at the intent of legislature."), this court is no more convinced of the intended outcome from the provision than before. At best, the only intent this court may glean from a review

there are still important policy reasons for reading the ambiguity narrowly. *See generally In re LaFata,* 483 F.3d 13 (1st Cir. 2007) (finding ambiguity, the court chose the construction that best comported with reading the exception narrowly). The *LaFata* court expressed its concern that broadening the scope of a special provision when an ambiguity supports two reasonable readings could result in undesired strategic behavior on the part of creditors in the future. *See id.* ("Indeed, if we were to allow [a] more expansive reading of § 1322(b)(2) here, we could face cases in the future of lenders seeking its protection even when they had never intended to lend against the debtor's principal residence.").

Were we to find ambiguity in the relevant language of the 910-day provision (and the court reiterates that it does not believe there to be any ambiguity), we would be faced with two conceivable constructions of the 910-day provision. The first interpretation—the construction supported by the plain language of the provision—would require that a creditor's purchase money security interest secure *all* of the underlying debt comprising the creditor's claim to qualify. The other reading would allow any creditor with a purchase money security interest in a 910-day vehicle to qualify for the exception, even though only part of the secured debt is purchase money security interest. The first construction is the narrower approach, the one generally to be preferred when construing exceptions to general rules. The second reading would create a broad exception to the general rule, one which could encourage lenders to roll into motor vehicle sales other debt (including other unsecured debt), hoping to shelter the resulting obligation from cram down – the very sort of strategic behavior that the *LaFata* could said should militate against such a construction in the section 1322(b)(2) context.

---

of the legislative history of this provision is that it is a special provision intended to benefit a certain type of secured creditor—one holding a purchase money security interest in a motor vehicle acquired within 910 days of filing or something else of value that was acquired within one year before filing.

As did the court in *In re LaFata*, this court finds the narrower approach comports best with accepted canons of statutory construction. The 910-day provision of section 1325(a)(*) should be construed as a narrow exception to the general rule allowing bifurcation and cramdown with respect to secured claims in chapter 13 confirmation.

In this case, FMC advanced funds to pay off the negative equity of the debtors' trade-in vehicle while also advancing funds to purchase the new vehicle. Because FMC's claim contains non-purchase money debt, FMC's claim does not qualify for the exception in section 1325(a)(*), and so is subject to the general provisions for secured creditors in section 1325(a)(5).

### CONCLUSION

As written, the new 910-day provision appended to section 1325(a) of the Bankruptcy Code affords special protection for lenders who obtain a purchase money security interest in motor vehicles purchased by the debtor within 910 days of the filing of a case under Chapter 13, so long as the purchase money security interest secures *all* of the debt comprising the creditor's claim. Texas' enactment of the UCC provides the common meaning of "purchase money security interest" and counsels us that the loan advancement attributable to paying off negative equity from the debtors' old vehicle is not part of the price of the 910-day vehicle. Contrary to FMC's contention, no Texas statutes may be read *in pari materia* to require otherwise. Furthermore the facts here indicate that the aspect of FMC's transaction with the debtors attributable to paying off the negative equity from the debtors' old vehicle was not value given that was actually used to enable the debtors to acquire rights in the 910-day vehicle. Accordingly, the negative equity portion of the secured debt claimed by FMC is not a purchase money security interest in the 910-day vehicle. *See* TEX. BUS. & COMM. CODE § 9.103(a)&(b).

-41-

Additionally, the plain language of the hanging paragraph of section 1325(a) clearly and unambiguously calls for an all-or-nothing rule protecting FMC's claim only if FMC's purchase money security interest secures *all* of the debt that is the subject of FMC's claim. However, because FMC's claim includes monies attributable to paying off negative equity from the old vehicle (which is a non-purchase money debt), FMC's claim does not meet this requirement. Therefore, FMC's claim does not qualify for protection under the 910-day provision of section 1325(a)(*). The claim is thus subject to the same ordinary treatment under section 506(a) accorded other secured claims, and may be treated under the plan pursuant to the provisions of section 1325(a)(5)(B)(ii). The debtors' plan is confirmable as proposed, and the court overrules FMC's objection.

A separate order consistent with this decision will be entered.

# # #